Estate of Charles Herman Koinm, Traders National Bank of Kansas City, Executor v. Commissioner.
Estate of Koinm v. Commissioner
Docket No. 60699.
United States Tax Court
T.C. Memo 1957-165; 1957 Tax Ct. Memo LEXIS 82; 16 T.C.M. (CCH) 728; T.C.M. (RIA) 57165; August 30, 1957
John E. Park, Esq., Bryant Building, Kansas City, Mo., for the petitioner. Sylvan Siegler, Esq., for the respondent. MURDOCK Memorandum Opinion MURDOCK, Judge: The Commissioner determined a deficiency of $9,731.65 in estate tax. The only issue for decision is whether the estate is entitled to a deduction under section 812(d) of the Internal Revenue Code of 1939 for bequests to charities. All of the facts of record were stipulated by the parties, and their stipulation is adopted as the findings of fact. [Findings of Fact] The decedent, Charles Herman Koinm, died on July 28, 1951. The estate tax return was filed with the collector of internal revenue for the sixth district of Missouri. The decedent created a trust on January 5, 1951. His *83 last will is dated January 4, 1951. He named Traders National Bank of Kansas City, Kansas City, Missouri, executor of his will and trustee under the aforementioned trust. The decedent, in his will, directed his executor to pay all of his just debts and all estate, inheritance, succession and transfer taxes due from his estate or assessed against any legacy or interest of any devisee, legatee or beneficiary under his will. He provided in Article II of his will that all of his remaining estate was to be held in trust by the Traders National Bank if his wife, Marjorie Sanborn Koinm, or his sister-in-law, Edna Chase Sanborn, survived him. Marjorie and Edna both survived him. The principal and income of the trust were to be held, divided and distributed as follows: "(a) I authorize and direct my said Trustee to pay to my wife, Marjorie Sanborn Koinm, such part of the net income derived from the trust estate as said Trustee in its sole discretion shall determine sufficient and adequate for the comfortable maintenance, welfare and support of said Marjorie Sanborn Koinm, not less frequently than quarter-annually, so long as she shall live. The entire remaining net income of the trust estate, *84 if any, after provision for Marjorie Sanborn Koinm shall have been made as aforesaid, shall be paid by said Trustee to my sister-in-law, Edna Chase Sanborn, not less frequently than quarter-annually, so long as she shall live. * * *
"(c) Upon the death of the survivor of the said Marjorie Sanborn Koinm and Edna Chase Sanborn, this trust shall cease and terminate and the Trustee shall immediately pay and distribute the entire remaining principal of the trust estate, together with any accumulated, undistributed net income thereon, free and clear of all trusts, in the following manner: "To my brother, ALBERT J. G. KOINM, Rural Route 11, Houston, Texas, $2,500.00. "To my brother, WILLIAM F. KOINM, 4005 Michaux, Houston, Texas, $2,500.00. "To my sister, LOUISE KOINM SPENCE, Rural Oute 11, Houston, Texas, $2,500.00. "The entire remaining principal of the trust estate, together with any accumulated undistributed net income thereon, after having made provision for the distributions hereinbefore provided in paragraph (c) of this Article, shall be distributed as follows: "To Agricultural & Mechanical College of Texas, Student loan fund, Bryan, Texas, one-half (1/2). "To the *85 Children's Mercy Hospital of Kansas City, Kansas City, Missouri, one-fourth (1/4). "To the Linwood Presbyterian Church, Kansas City, Missouri, one-fourth (1/4). "(d) So long as my said wife, Marjorie Sanborn Koinm, or my said sister-in-law, Edna Chase Sanborn, shall live, they shall have the right to use and occupy without the payment of any rent or other compensation therefor, any residential property owned and occupied by me at the time of my death. "(e) The trust created herein is a trust primarily for maintenance and I direct that the net income derived from the trust estate be paid to the beneficiaries thereof in accordance with the provisions hereof beginning from the date of my demise. Without intending thereby to vest any enforceable right in said Marjorie Sanborn Koinm or Edna Chase Sanborn, the Trustee is further authorized and empowered, in its sole and absolute discretion, in the event of illness, accident or other misfortune or in the event of any emergency, or if in the judgment of the Trustee it is necessary for the comfortable maintenance or support of either of said beneficiaries (in the manner they now enjoy), to pay to or for the benefit of said Marjorie Sanborn *86 Koinm or Edna Chase Sanborn such sum or sums from time to time out of the principal of the trust estate as the Trustee in its sole judgment shall deem necessary." The will authorized the trustee to combine or consolidate the corpus and income of the testamentary trust with that of any similar trust created by the decedent under which the trustee and the general provisions of the trust were substantially the same. The inter vivos trust dated January 5, 1951, contained provisions substantially identical or identical with those of the will quoted above. The corpus and income of the inter vivos trust were combined and consolidated with the corpus and income of the testamentary trust pursuant to that provision. The two brothers and sister mentioned in Article II(c) of the will and in the inter vivos trust survived the decedent. They were to receive a total of $15,000 from the two trusts. The three residuary beneficiaries mentioned in the same paragraph of the will and in the inter vivos trust were all charitable organizations within the meaning of section 812(d). The petitioner computed the value of the life interests of the widow, Marjorie, and her sister, Edna, determined the value *87 of the remainder interests of the three charities to be $63,486.42 and claimed that amount on the return as a deduction under section 812(d). There is no dispute as to the mathematical correctness of that computation. The Commissioner, in determining the deficiency, disallowed that deduction and explained it was "* * * disallowed since as of date of [decedent's] death the corpus of the trust created by decedent's Will and also the corpus of the trust created by decedent under date of January 5, 1951, was subject to invasion for the benefit of two life beneficiaries and the possibility of invasion is not so remote as to be negligible. The deduction is therefore disallowed under section 81.46 of Regulations 105. See decisions of U.S. Supreme Court in the following cases: Merchants Nat. Bank of Boston v. Com., 320 U.S. 256; Union Planters Bank and Trust Co. v. Henslee, 335 U.S. 595; Com. v. Sternberger, 348 U.S. 187; 75 S. Ct. 229, 55-1 USTC 11504." Marjorie, who was 64 at the time of the decedent's death, had developed presenile dementia in 1944, was committed as a private patient to a state hospital for the insane on March 21, 1949, was *88 moved on June 6, 1951, to Bennett Manor, Inc., a private nursing sanitarium for mentally ill persons and was a private patient in the latter institution at the time of decedent's death. The decedent had Marjorie admitted to the latter institution, and the rate agreed upon for her care there was $150 a month, not including medication and personal physician's charges. Marjorie had a personal physician attending her at Bennett Manor. He diagnosed her condition as cerebral arteriosclerosis. She was mentally incompetent. Marjorie had no personal income or estate other than their residence which she and the decedent owned as tenants by the entirety. The value of the residence at the time of the decedent's death was $15,000. She was completely dependent upon the decedent for support, care and maintenance. Edna, who was 70 at the time of the decedent's death, never married and had no dependents. She had been employed by the State of New York as a school teacher, but in 1948, at the request of the decedent, she retired as a school teacher and came to the decedent's home in Kansas City to be near her sister, Marjorie, and to assist in the care and management of the household. She has continued *89 to live in that home since the decedent's death. She was receiving a lifetime pension of $100 per month from the State of New York and had a personal estate of approximately $2,200, the income from which amounted to $66 per year at the time of the decedent's death. She did not own an automobile. The decedent, a graduate engineer of Texas A. & M., was employed by the Gas Service Company in Kansas City, Missouri, from 1925 to the date of his death. He became General Superintendent in 1929. His salary was $6,600 per year in 1942 and gradually increased to $11,296.60 for 1950. He had additional income which increased from about $1,000 in 1947 to about $3,000 a year at the time of his death. He maintained the home and was providing for the care, maintenance and support of both Marjorie and Edna at the time of his death. The total value of the principal of the inter vivos and testamentary trusts at the date of his death was $104,861.97. The record does not show what the income of the inter vivos trust was for the period from its creation on January 5, 1951, to the date of the decedent's death on July 28, 1951. His gross estate, as shown on the estate tax return, amounted to $133,602.80 *90 and consisted of stocks and bonds $51,978.72, cash $4,315.81, life insurance $61,554.27 and jointly held property $15,754. His funeral and administration expenses and debts were shown as $10,715.98. The present decedent preferring to insure the comfortable maintenance of his wife and her sister, hedged his philanthropy and permitted invasion of the corpus for the benefit of the primary objects of his bounty, the life tenants. A definite possibility exists that at least a part of the principal will be used, and consequently the present value of the remainder which the charities will receive is not readily ascertainable. The question is "whether the bequests to the charities have, as of the testator's death, a 'presently ascertainable' value or, put another way, whether as of that time, the extent to which the widow could divert the corpus from the charities could be measured accurately." Merchants National Bank of Boston v. Commissioner, 320 U.S. 256. Here the above should be read to include not only the needs of the widow but also those of her sister, Edna. The Supreme Court also said in that case that: "* * * Congress and the Treasury require that a highly reliable *91 appraisal of the amount the charity will receive be available, and made, at the death of the testator. Rough guesses, approximations, or even the relatively accurate valuations on which the market place might be willing to act are not sufficient. * * * Only where the conditions on which the extent of invasion of the corpus depends are fixed by reference to some readily ascertainable and reliably predictable facts do the amount which will be diverted from the charity and the present value of the bequest become adequately measurable. And, in these cases, the taxpayer has the burden of establishing that the amounts which will either be spent by the private beneficiary or reach the charity are thus accurately calculable. * * *" [Opinion] The Commissioner contends that the deed of trust and the will do not limit the payments to the life beneficiaries to any standard "fixed in fact and capable of being stated in definite terms of money," the value of the charitable remainders could not be determined with reasonable accuracy at the date of the decedent's death and consequently no deduction is allowable. The petitioner argues, however, that at the date of the decedent's death the possibility *92 of substantial invasion of the corpus for the benefit of the life beneficiaries was so remote as to be negligible. This decedent used no such vague terms as "happiness," "desire" or the like, but, instead, limited the payments of income to or for the life beneficiaries to what might be needed for their comfortable maintenance, welfare and support. But he provided, in addition, that the principal of the trust could be used, if deemed necessary by the trustee, for the expenses of any illness, accident, other misfortune or emergency or, again if necessary, for their comfortable maintenance or support "(in the manner they now enjoy)." Cf. dicta in Berry v. Kuhl, 174 Fed. (2d) 565, 568, re use of principle for "'accident, illness or other cause' without more * * *." Even if it be assumed, for the purpose of discussion, that those provisions represent a standard fixed in fact and capable of being stated in definite terms of money, nevertheless several questions must still be answered satisfactorily from the stipulated facts before the presumption of correctness attaching to the Commissioner's determination is overcome. The petitioner would have to show, in terms of money, *93 the standard of living to which the two life beneficiaries were accustomed; how much income could reasonably have been expected from the combined trust; the remoteness of the possibility of substantial invasion of the trust corpus and the resulting value of the charitable remainders at the date of the death of the decedent. This is not a case like Ithaca Trust Company v. United States, 279 U.S. 151, in which "The income of the estate at the death of the testator and even after debts * * * had been paid was more than sufficient to maintain the widow [and her sister] as required." It can not be assumed that the income from a trust fund of about $104,000 would be ample for the future uses of these two life beneficiaries as provided by the decedent. Substantial invasions of principal, pursuant to the provisions of these instruments, were not at all improbable at the time of the decedent's death, and his provision for such invasions could not be described as made because of undue caution on his part. The stipulated facts must be examined to determine whether the petitioner has sustained its burden of proof. Marjorie, of course, was in an institution for mental patients *94 and would probably require such care for the rest of her life. Her life expectancy is not shown by the record, but according to generally accepted tables, it was 13 years. The then current rate for her institutional care, exclusive of medicines and attending physician's charges, was $150 a month. The record contains no evidence of what the physician's charges and costs of medicines, if any, had been up to the time of the decedent's death, of what future expenses of that kind might reasonably have been expected or of the probability as to whether, when and to what extent the charge for care, board and lodging might be changed in the future. It was then generally known that all hospital and sanitarium charges had been increasing and were then likely to continue to increase. [1] What were the chances that her condition might worsen and cause additional expenses to be incurred? How can it be said on this record that the necessary payments reasonably to be anticipated for Marjorie would not approach or even exceed the income which the trust corpus might reasonably have been expected to produce and to which she had the first right? *95 Edna was 70 at the time of the decedent's death. The record does not show her life expectancy, but according to accepted tables it was 10 1/2 years. Apparently she was in good health at that time. She was receiving a pension of $1,200 a year and had additional income of $66 per year. She was living in the decedent's home at the time of his death and his will provided that she could continue to live there for the rest of her life. The trustee undertook the payment of the taxes on the house and the cost of repairs. The taxes might have been estimated within reasonable limits. However, the evidence does not show what would have been a reasonable estimate at the time of the decedent's death of those taxes or of the cost of upkeep on the house during the lives of the life tenants. The record does not show how much Edna earned as a teacher, and there is little to show the standards of living to which she was accustomed while teaching or while residing with the decedent. Apparently she lived alone without any domestic help or other assistance. It might have been reasonable to anticipate that in the not too distant future she would need a domestic servant, an attendant of some kind, or possibly *96 both. It would be foolish to assume that she would not have medical expenses, and they could mount up to a substantial amount. Any figure selected by the Court on this record as reasonable living expenses for Edna during the remainder of her life would be little more than a guess. Whatever she might need would have to be paid to or for her, and if the income of the trust, above that needed for Marjorie, was not sufficient, then the difference would have to come out of the corpus. Other charges which could have been anticipated were the trustee's annual fees and possibly other administration expenses. It might be reasonable to assume that not all of the trust corpus would ever be used for the support and maintenance of the two life beneficiaries, for the administration of the trust, for the taxes and upkeep of the home property and for the payment of the $15,000 to the decedent's brothers and sister. Cf. Estate of Ozro Miller Field, 45 B.T.A. 270, 273, reversed sub nom. Merchants National Bank of Boston v. Commissioner, supra. The decisions are, however, that no deduction can be allowed for charitable remainders unless their amount can be determined with *97 reasonable certainty at the time of the decedent's death. The petitioner must lose for failure to sustain its burden of proof. Decision will be entered under Rule 50. Footnotes
1. The stipulation shows a number of facts which were not known at the time of the decedent's death and which, for that reason, have little, if any, probative value herein, absent evidence that they could have been expected. One of those is that the sanitarium rate was raised to $200 per month on April 6, 1952, which corroborates what might reasonably have been expected at the time of the decedent's death.↩